21-6046. Mr. Smith. May it please the court, counsel. Grant Smith with the Federal Public Defenders representing Dominic Hunt. The theories and methodologies underlying firearm toolmark examination can be tested. They could be confirmed or falsified. The problem here is that sufficient testing has not been done. Accordingly, the district court committed two distinct errors when it admitted the evidence. The first error is that the court did not conduct its own independent review of the available evidence. Instead, the court relied or substituted its own assessment with the assessment of other district courts. And this becomes clear when you look to the court's analysis on the very first factor. The court cites two things. The first thing is a website, an ATF website, that compiles every single study that's ever been done on this theory since it started. Some of these studies are 60, 70 years old, and many of them have absolutely no relevance to the theory as it applies to Mr. Hunt's case. The court wasn't conducting a review of the evidence by merely looking at that website. What the court was doing, the other thing it cites, is two district court cases. And it substitutes their analysis as to that factor for its own. And the problem with this is twofold. First, it creates the danger of grandfathering in irrationality. And second, it grandfathers in inapplicable science. As to that second point, if you look at the court's order, it references the Miami-Dade study as to the calculation of a known error rate. And this is because it's copy and pasting from Romero-Lobata. But the Miami-Dade study has nothing to do with the theory as it was applied in this case. That study was about the markings left on a bullet. And the idea is, when a drill bores down into a metal rod to create the rifle or the barrel, there'll be striations left inside the barrel. And those striations will create marks on the bullet as it exits. That wasn't at issue here. Here, what was discovered at the crime scene was a cartridge case that doesn't travel down the barrel of a gun. That's discharged after the bullet is fired. And whether or not a firing pin or the breech face is going to leave unique signatures on a cartridge case wasn't discussed in any way in the Miami-Dade study. So this just demonstrates that the court was not conducting a careful and meticulous review of the evidence as it was applied in this case. Isn't it the same principle that manufacturing flaws or use or something causes markings on what goes through the equipment, the gun, whether it's down the barrel or some other process? Isn't it the same underlying principle? It's the same for a cartridge and a bullet? On a very high level of generality, yes. But what's different here and what needs to be appreciated is that your firing pin isn't manufactured in the same way that a barrel of a gun is. And so the idea that they're going to leave distinct markings is different and is material different because the firing pin is going to leave, the idea is that the firing pin leaves a mark by the way it strikes the cartridge case. And you present, and you made this argument to the district court that there's a difference between the cartridge and the bullet? No, not at all. Our objection to the district court was that there was just insufficient science for this to be deemed reliable. The government court... Why wouldn't it be reasonable for the judge to think that there's not a big difference between what happens to a cartridge and what happens to a bullet absent some argument from counsel explaining why that's a big difference? Because at face value, I think it's obvious that there's a difference whether something traveling down a barrel is going to pick up marks from that barrel or whether something striking an object is going to... When did you first raise this distinction in court? Is it just now? Did you raise this in your brief? No, this is just, I mean, the more you begin... You're just raising this for the first time in oral argument? As just additional evidence that the district court was not conducting a meticulous review. I mean, what we did point out was... I mean, it might be a good argument, but this is an awfully late time to be presenting, it seems to me. Well, this is just an addition to what we were saying about the mortgage... Well, it's an addition, but maybe we should... Then we'll look at what you said before. I'm not sure we should be considering... I mean, it's an interesting argument. It may be very good, but it's not good form to be raising it at the last minute when there's not a real opportunity to respond. Well, I'm not sure that's right, because the government, as the proponent of this evidence, had the burden. And so what they did to show that this was reliable was cited a website which just had the citations and summaries from hundreds of cases. So you have no obligation to argue what's unreliable about the sources relied on by the government or the court? No, the government has the burden of proving unreliability. Okay. I mean, it's... I don't know how courts are supposed to do their job if the side without the burden just says, well, not enough. Well... That's not really helpful to the court. Sure. And if the court had had a hearing where this would have been presented, where there would have been arguments to point all this out, I think it would be a fair accusation that defense... Why can't you raise it? Well, maybe there wasn't a need for a hearing because you hadn't argued it in the briefing. Well, the briefing, the chronology of the briefing was that we filed a motion to exclude. And at that point, it puts the burden then shifts to the government to prove that this is reliable. And you filed no response? There was no reply filed to the government's response. No, the court just entered an order denying a doubt-based hearing. Did you seek to file a response to the government? Were you denied the opportunity to file a response to the government? Nothing in the record indicates either of those. So I would say, no, they did not seek a response to file a reply to the government or seek the court's leave. See, that's the reason why it seems proper for the district court to look at what other courts have said. You say that was an abdication of responsibility by the district court, but that's how you find things like this. You read the case law. You see what other judges and courts have said about it. And you see if there's something maybe that way that this court can say to the government, well, what about the difference between a cartridge and a bullet? Yeah, and I think that that's right. There is a role for other district court opinions to play in this. I think the harm here is that the district court looked at other district court's decisions that either could not or did not analyze the most up-to-date evidence. I mean, what the court looks at this idea of grandfathering and irrationality. It copies and pastes from the Romero-Lobato decision that the unfavorable publication in the PCAST report tips in favor of relying on... How old was that decision? The Romero-Lobato was from 2019. What's important, though, is that Romero-Lobato relied on all PCAST and all NAS decisions to reach its conclusion. So they've just sidestepped any analysis of the most up-to-date science by looking at these decisions that came out before. And what post-2019 science or more recent science did you present to the court? We presented the NAS report, the PCAST report, the NRC report. We noted to the court that, hey, advancements in manufacturing really called this theory into question. The idea at the beginning made sense that when you're hand-tooling... When was this gun manufactured? We don't know. The gun was never found. So in order for the government to show that this theory is reliable as to all guns, which is the universe of guns that they're supposedly looking at, they would have to show that a modern manufactured gun is subject to creating these unique signatures on a cartridge case or a bolt. And why would not a more modern gun leave signatures like this? I think that the Green decision is really illuminating because she did hold an actual Daubert hearing in this case and went through the process or the methodology and, I guess, how guns are manufactured. And she notes that the original idea starts with hand-tooling, that someone's hand-tooling a gun and they're going to leave unique marks on that gun. That evolves into machine-tooling, and that machine-tooling gets further refined. So at this point, the way to use the... She focuses on the bullet unique markings. So when this drill is going down into boring into each of the barrels, the idea is that it leaves a microscopic, not even a minute amount of metal, which each drilling. And then that means that it's going to get slightly smaller for the next barrel that it pours down into. And then somehow someone is able to differentiate between that tiny little amount of metal that's lost between the drilling process and tell you which gun it was fired from. But as it becomes... Here in this case, the bullet showed a rather significant mark, did it not? Well, first of all, it wasn't bullet. It was a cartridge case. I think that's very important. No, I don't think it did. I mean... It looks like there's a... The picture in the briefing from the record, that's not a big mark? I don't think we can say so. And I say this because of the green opinion where it notes the firing pin might strike... The firing pin might strike the primer on the cartridge case differently every time. So maybe it is a different mark, but that might not reveal anything. It might just mean that the firing pin had moved a little bit because the gun got tossed in the back of the car. So here, the two marks on the two bullets are rather similar. Do you grant that? Is your point that we don't know if there might be a hundred different weapons that could have left that same mark? Or are you saying that these really aren't quite similar? I'm saying we have... Well, both, I guess. I mean, as to... I think I need to make clear that there's actually, you know, three test samples that are subject to Mr. Kong's testimony. There was the samples from the two guns that were discovered from Mr. Carter and Mr. Dawson. And I think that's what you're referring to, where the primer markings look different on those in the photos in the briefing. And then there's the cartridge cases from the two shootings, the January and the February shooting. So his testimony was that the test firings from Mr. Carter and Mr. Dawson's guns, those were eliminations because the markings were too dissimilar. Our position would be, one, maybe they're dissimilar. I don't know. I don't... I can't tell just from those photos. But if they are dissimilar, what does that mean? I don't think there's any scientific or empirical studies showing what that means. And as to the cartridge cases collected from the two shootings, I couldn't tell whether they were similar or dissimilar. Mr. Kong testified that he could conclude with a reasonable degree of ballistic certainty that they were fired from the exact same gun. Well, there are two issues. One, are they closely similar? And second, what's the significance of that? And I would think an expert looking at these could say, this is, you know, in my experience, you don't find many cartridges or bullets that have a distinctive mark like that on... when they've been fired from different guns. That's something you can say from his experience. Maybe you can't tell the difference, but there is some value of expertise here, is there not? I think that brings up a good point about the distinction between experiential and scientific testimony. This wasn't presented as experiential testimony. He wasn't saying, you know, I've looked at a bunch of bullets in my life. These ones look similar. He was saying... What difference does that make under Dauberg? The question is whether it's admissible under Dauberg. Do we have to pigeonhole the testimony and say this is experiential and this is scientific? No, but I think, as Dauberg says, evidentiary reliability means scientific validity. The only way you could possibly get around that is to say, well, scientific validity just doesn't apply to this. Think of the police officer that says, in my training and experience, drug couriers always sit in the back of the bus. Well, you can't test that. You don't know an error rate for that. So you have to look at other factors to conduct a reliability assessment. And you're saying the witness's experience cannot be relied on in this case? But that's not how it was presented to the jury. This was presented with the imprimatur of science. He gets up, the very first thing out of his mouth is, I work at the science laboratory. It's a controlled laboratory. Here's my lab report. If you want to convey that type of authority to the jury, then it has to be scientifically valid. Was there no, when he was introduced as a witness, there was no testimony about his experience in this field? There was to build up his credibility to the jury. But on top of that, they presented this as a scientific theory. Okay. There's no further questions. I reserve the remaining. Ms. Hutzel. May it please the court, Jacqueline Hutzel for the United States. To be clear, I'm not here today asking you to rewrite the Daubert factors or to find firearms identification admissible in all cases ever. What I'm here today asking you is to find the district court properly and permissively admitted Mr. Kong's opinion that the same firearm fired the blazer nine millimeter ammunition in both that shot both Mr. Bryson and Mr. Wright. Considering the district court's careful month long analysis and 17 page order, Mr. Kong's detailed and abundant evidence provided by the United States, the existing safeguards, and the broad latitude given to the district court by the Supreme Court in both Daubert and Kumo Tire, this is not even a close call. Well, counsel says you can't rely on Kumo Tire. That's experiential. That was a guy who'd worked with tires for years and could talk about that. Sure. I'm not sure exactly how counsel gets around Kumo Tire, which the Supreme Court very clearly says applies Daubert to both scientific and experiential and specialized. And I would like to note also that the court in this case in the order specifically said it did not even need to decide whether or not it was scientific because it found at the very least this was specialized and experiential knowledge that the court. The judge did say that. Yes, in a footnote in the order. But it wasn't presented to the jury that way? I believe it was. I don't believe there needs to be. You need to tell the jury specifically this is scientific. It's experiential. This is specialized. It's the judge's determination. But the witness said this is scientific or did he? I don't believe he said specifically it's scientific. He certainly stated that he worked in a lab with the word science in it. And I think he went through all of the various, the scientific, also his experience, the specialized aspects of this. And I think that rather than wholesale exclusion based on this sort of thing, that's exactly the point of vigorous cross-examination, presentation of contrary evidence, careful instruction about the burden of proof, and limitations on the testimony as if it was important for the jury to understand whether or not it was scientific or not. That's something that the defendant clearly had the opportunity to discuss on cross-examination. If it was something that was not coming across to the jury how they thought it should. Isn't the problem here, I mean, it's a bigger, broader question, I think. Isn't the problem here what the district court relied on? It didn't look to evaluate this expert's submissions or its methodology. It simply looked at other case law. I think that that is obviously... And dated information. I think that's obviously... Doesn't it have an obligation to do a specific analysis here of the submissions of this expert? Yes, I absolutely wanted to address that. So, I think it's important to note that the broad latitude and abuse of discretion apply both to the ultimate determination and to the manner that the court used, which I think does include whether or not the court looks at and analyzes case law. I think that the Tenth Circuit and the Supreme Court, neither of which have ever said that the court can't look at case law in order to do its stobbard analysis. And the question here, I think... Is there any case supporting essentially that's all the court did here? Well, I think that's not what all the court did here. And I'd like to really point out why I believe that. And I think that the concern with whether or not the court relied entirely on case law, which I don't believe it did here, but I think that the concern is, as actually stated in the PCAST report, is that the concern is that the court would then defer to past precedents. They would be obliged to. They'd say, this was done before. We have to admit it again. And I think that's obviously not what happened here. And I'd like to just walk through the district court's order, looking at the reliance versus support. So first of all, in the Supplemental ROA Volume 1, page 13, the court admits this is hardly novel. This is semi-automatic. This is routinely admitted. It acknowledges that the case law has been letting this type of identification in routinely. But then it specifically says, quote, However, because of the seriousness of the criticisms launched against the methodology underlying firearms identification by the defendant in this case, the court will carefully assess the reliability of this methodology using Daubert as a guide. And then it does just that. So with Factor 1, for example, the court goes to the AFTE website, which is the firearms methodology with the standards here. And it looks at the testability of the scientific principles, which collects all of the studies that have tested the science in this case. And it uses that to support its conclusion. It then says, quote, This conclusion is supported by other courts, and then looks at the other courts that have come to the same conclusion that this court did on its own. And that's on page 14. With the second factor, the court does use Romero-Lovato, the description of the AFTE journal, to look at, which arguably it could be using just simply because they said it best, and it's quoting it. But it didn't just stop at Romero-Lovato's description. It then went on its own, not reliant on any other courts, and considered and rejected Mr. Hunt's argument to only consider black box studies in reference to this factor. With Factor 3, the known or potential rate of error, the court on its own declined to restrict, again, review to only black box studies. It noted that federal cases had a reported low error rate, but it also said that it was specifically considering the Miami-Dade and Ames studies. With the fifth factor, general acceptance, the court specifically, not reliant on other courts, considered the criticism of the PCAST report and found, quote, It does not undermine the court's conclusion. It stated that it looked specifically at the acceptance of other courts, both before and after the PCAST report was submitted, and it found that that did not undermine its conclusion and that universal acceptance was required. The court used in its order, it used more than simply cases in its analysis. It used the AFTE website, which collected studies and also links specifically to those studies. It also specifically quoted and looked at the PCAST report itself. And in addition, the court looked at the evidence, which was sufficient in this case. The United States provided over 93 pages of exhibits, which included detailed reports of two different examiners. It included computerized NIBIN lead, lab accreditation, CVs, reports from two different examiners, their case files entirely, Jones and Mr. Kong, which included, those case files actually included worksheets, photos, drawings, case notes, and detailed comparison photos, which the court would be able to and could have looked at and compared themselves. And those pictures I encourage the court to look at. I don't really know if the court did that. Well, the court actually did say in its order, it listed the evidence that it considered, including the detailed reports of Mr. Jones and Mr. Kong, the peer review of reports and findings, experience, qualifications, certifications, continued training, and case specific facts detailed, which it actually listed out. And the court, in fact, cited all of the attachments in its order. I'd also like to point out that the evidence in this case was far stronger than the evidence that was presented in the United States versus Faust, where this court affirmed the admission of handwriting analysis in that case. In that case, the court at least conducted a hearing, correct? Yes, that is correct. But no evidence was submitted. I don't even believe that there were briefs submitted. I think the hearing was the only information provided at that point. In Faust? Yes. And I would like to point out that a hearing is not required, that the court actually addressed why it was not conducting a hearing and it said specifically, one, that it was not required, and two, that it was unnecessary due to the briefings and evidence. I'd also like to point out with regards to what counsel said, that they did not file a reply brief and there was no hearing. It was fully briefed on April 27th. The judge's order did not come out until June 1st. There was well over a month's time for any reply to be requested, any further information to be provided to the court, and I think that's also further evidence that this was not the court's sort of off-the-cuff decision that is supposed to be prevented in this actual performing of a gatekeeping function. If there are no further questions, in short, I believe it's abundantly clear the district court did perform its gatekeeping function and was well within its discretion to admit Mr. Kong's testimony that the same firearm shot the bullets that shot Mr. Bryson and Mr. Wright, and we would ask that this court defend. Thank you. Thank you, counsel. I think you have a few seconds left. I'll give you a minute. Two points. The first is, as to the documents attached to the government's motion to admit the 960 exhibits, none of them had anything to do with studies or reviews of this science as a whole. They were just Dr. Kong's conclusions and methods. The only thing the government can point to as a study for that is the ATF website. That's it. That's the only thing it provided to the district court. The second point is, as this court said in Goebel, the district court is obligated to conduct a careful and meticulous review of the evidence before admitting it. There's no discretion to that. I'm concerned that the lack of evidence challenging it. Are we asking the district courts to do the work for the party that's challenging it, to do their work for them, and that's their obligation? That's not the way we usually do things. We have an adversary system to evaluate this, and there may be very good arguments that weren't made until this morning. Is that really where we should be? I see I'm out of time. Could I answer your question? Of course. I don't think that's a correct characterization in this case because there's the PCAST report which studied all of the evidence, all of the studies behind this theory, and our nation's leading scientist said that this is not scientifically validated. We presented that to the district court, a complete review of all the science, and at that point, yes, the district court was obligated to conduct a deeper dive into the evidence, not just relying on a single website. Any other questions? Thank you, counsel.